**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **Seabulk Challenge LLC, and Seabulk Tankers Inc.** *Plaintiffs*, | § | |
| **AND** | § | |
| **AdvanSix Inc.** *Intervenor-Plaintiff*, | § | **C.A. No. 3:22-cv-00089** **Fed. R. Civ. P. 9(h)** **Admiralty** |
| **vs.** | § | |
| **LPG/C GASCHEM NORDSEE, her equipment, engines, tackle, apparel, and appurtenances, *in rem*, et al.** *Defendants*. | § | |

**ADVANSIX INC.'S ORIGINAL COMPLAINT-IN-INTERVENTION**

INTERVENOR AdvanSix Inc. ("AdvanSix") files this Complaint-in-Intervention under Federal Rule of Civil Procedure 24, and would respectfully show as follows:

## I. PARTIES

1.1 Plaintiffs Seabulk Challenge LLC and Seabulk Tankers Inc. (collectively "SEABULK CHALLENGE Interests") are the owners and operators of the M/T SEABULK CHALLENGE (IMO 7816551).

1.2 Intervenor-Plaintiff AdvanSix Inc. is a corporation organized and existing under the laws of the State of Delaware with an office and its principal place of business located at 300 Kimball Dr, Parsippany-Troy Hills, New Jersey 07054. At all relevant times, AdvanSix was the time charterer of the M/T SEABULK CHALLENGE (IMO

7816551) under a SHELLTIME 4 time charter agreement ("Charterparty") with Seabulk Challenge LLC dated October 27, 2020, attached as **Exhibit A**.

1.3 Defendant Harpain Shipping GmbH ("Harpain"), *in personam*, is a company organized under the laws of Germany and at all material times was the commercial operator of the LPG/C GASCHEM NORDSEE (IMO 9402562) and may be served via the Texas Secretary of State's Office and/or via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.[1]

1.4 Defendant Erste Beteilgungs Kommandtgesellschaft Tim Shipping mbH & Company ("Erste"), *in personam*, is a company organized under the laws of Germany and at all material times was the registered owner of the LPG/C GASCHEM NORDSEE (IMO 9402562). Erste has appeared in this action and may be served by its counsel of record.[2]

1.5 Defendant Harpaingas GmbH & Company KG ("Harpaingas"), *in personam*, is a company organized under the laws of Germany and at all material times was the technical manager of the LPG/C GASCHEM NORDSEE (IMO 9402562). Harpaingas has appeared in this action and may be served via its counsel of record.[3]

1.6 Defendant GasChem Services GmbH & Company KG ("GasChem"), *in personam*, is a company organized under the laws of Germany and at all material times was the operator of the LPG/C GASCHEM NORSEE (IMO 9402562) and may be served

1 Harpain has not yet appeared, nor has a summons been requested or issued.
2 Erste has appeared and filed an answer (Doc. 9).
3 Harpaingas has appeared and filed an answer (Doc. 9).

via the Texas Secretary of State's Office and/or via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.[4]

1.7 Defendant LPG/C GASCHEM NORDSEE (IMO 9402562), *in rem*, is a liquified petroleum gas carrier that is operated, managed, and owned by defendants listed in paragraphs 1.3-16, *supra* (collectively "GASCHEM NORDSEE Interests). A Letter of Undertaking ("LOU") has been issued by GASCHEM NORDSEE Interests' insurers in favor of AdvanSix, which LOU obligates an *in rem* appearance of GASCHEM NORDSEE in this matter.

## II.
## VENUE AND JURISDICTION

2.1 This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1333.

2.2 Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions underlying this action occurred in this District.

2.3 Intervening-Plaintiff's claims are properly pled under FED. R. CIV. P. 24(b).

## III.
## FACTS & INTERVENOR'S CLAIMS

### A. The Charterparty

3.1 Prior to the occurrence of this casualty, the M/T SEABULK CHALLENGE (IMO 7816551) was and is a 1981 built United States-flagged oil and chemical tanker of 29,832 gross tons, owned and operated by Seabulk Challenge LLC and Seabulk Tankers Inc.

[4] A summons has been issued for GasChem (Doc. 4) but they have not yet appeared.

3.2 Pursuant to the Charterparty, the M/T SEABULK CHALLENGE was delivered to AdvanSix on or about June 15, 2021, for a charter period of 2 years and 10 months.

3.3 AdvanSix is a vertically integrated manufacturer of chemical products and routinely charters vessels like the M/T SEABULK CHALLENGE to carry its cargoes between locations in the United States and the rest of the world.

3.4 The Charterparty contains various provisions including a New Jason Clause[5] which provides in relevant part:

> In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.

*See* **Exhibit A** § 37.

3.5 The Charterparty also contains an Unplanned Offhire clause which provides:

> In the event the Vessel encounters an unplanned off hire event that is expected to last in excess of twenty-five (25) days and the Owner is unable to provide short term coverage after ten (10) consecutive days of off hire and the Charterer is required to complete a spot voyage at the then prevailing market rates thereafter, then the Owner will reimburse the Charterer for document spot voyage costs less the daily Rate of Hire under this Charter and fuel and port charges for actual spot voyage

[5] According to the Fifth Circuit, the purpose of a Jason clause is "to spread the risks among all participants in the venture." *Amoco Transp. Co. v. S/S Mason Lykes*, 768 F.2d 659, 668, fn. 11 (5th Cir. 1985).

> days. Charterer shall be allowed to perform a maximum of one (1) full round trip voyage, and if off hire extends to thirty five (35) days, then Charterers will be allowed a second (2nd) full round trip voyage Owners' cumulative net obligation for such reimbursement shall be capped at $1,500,000 for the term of the Charter.

*See* **Exhibit A** § 9 (SHELLTIME 4 Additional Clauses).

## B. The Allision

3.6 On March 11, 2022, around 1840 hours the M/T SEABULK CHALLENGE was berthed at Galveston's Pier No. 16 along the Galveston Ship Channel, when the LPG/C GASCHEM NORDSEE allided with her port stern quarter.[6]

3.7 At the time of the allision, she was under charter to AdvanSix, carrying AdvanSix's cargo, and loading more cargo of cumene from a barge on her port side

[6] *See* Coast Guard investigates collision in Galveston channel, GALVESTON COUNTY DAILY NEWS, dated March 14, 2022 available at https://www.galvnews.com/news/police/free/article_976a67db-a665-5eec-9cbb-d9ff57c6caa7.html (last accessed July 12, 2022).

3.8 The allision parted several mooring lines and damaged the M/T SEABULK CHALLENGE's port stern quarter and starboard side gangway.

3.9 Following the allision, the M/T SEABULK CHALLENGE needed repairs, and AdvanSix placed the vessel off-hire under clause 21(a)(i) of the Charterparty:

> (a) On each and every occasion that there is a loss of time (whether by way of interruption in the vessel's service or, from reduction in the vessel's performance, or in any other manner); (i) Due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel; stowaway or any other similar cause preventing the efficient working of the vessel; and such loss continues for more than five (5) consecutive hours (if resulting from interruption in the vessel's service) or cumulates to more than five (5) hours (if resulting from partial loss of service from the same cause);

*See* **Exhibit A** § 21.

**C. The Damages**

3.10 As a result of the allision, AdvanSix incurred various expenses[7] totaling at least $6,200,000, including, but not limited to,:

- Barge costs to transfer cargo from the SEABULK CHALLENGE to the OVERSEAS HOUSTON, and also to lift cargo from terminals as per contractual obligations:
- Spot Charter of OVERSEAS HOUSTON for substitute voyage and related costs;
- Spot Charter of PETROCHEM TRADER and related costs for the return voyage;

[7] The supporting documentation for these costs and damages have been produced to all parties pursuant to a confidentiality agreement and are not attached as exhibits.

- Spot Charter of PETROCHEM PRODUCER to load balance of SEABULK CHALLENGE cargo;

- Cost of "cover cargo" to fulfill contractual obligations with customers.

**D.    Claims**

3.11    Under General Maritime Law, the GASCHEM NORDSEE Interests owed AdvanSix and the SEABULK CHALLENGE Interests a duty to observe the standards of good and prudent seamanship, and a duty to exercise ordinary and reasonable care while operating in the Galveston Ship Channel.

3.12    Additionally, the GASCHEM NORDSEE Interests had the statutory duty to follow the Inland Navigation Rules and the United States Coast Guard Regulations while navigating the Galveston Ship Channel so as to minimize the risk of allision.

3.13    The GASCHEM NORDSEE Interests breached these duties through the following instances of negligence, negligence *per se*, gross negligence, and/or recklessness:

a)    The unseaworthy condition of the LPG/C GASCHEM NORDSEE;

b)    Failure to navigate, steer, and control LPG/C GASCHEM NORDSEE properly and in accordance with the applicable rules of navigation and/or industry customs;

c)    Carelessly navigating LPG/C GASCHEM NORDSEE without heeding all forces to be considered by a competent navigator;

d)    Failure to properly supervise LPG/C GASCHEM NORDSEE's crew;

e)    Failure to properly train their employees and/or LPG/C GASCHEM NORDSEE's crew;

f)    Operating LPG/C GASCHEM NORDSEE with an inadequate crew;

g) Failure to take reasonable action to prevent or minimize the events that precipitated the allision;

h) Failure to operate LPG/C GASCHEM NORDSEE with ordinary and reasonable care;

i) Negligently implementing or failing to implement policies and procedures appropriate to conduct maritime operations safely;

j) Violating U.S. Coast Guard, IMO, and/or other applicable regulations intended to prevent allisions; and

k) Other acts or omissions deemed negligent, grossly negligent, negligent *per se*, and/or reckless to be shown at trial.

3.14 The GASCHEM NORDSEE Interests were negligent in operating, manning, training, and/or controlling LPG/C GASCHEM NORDSEE. Moreover, the captain, pilot, and/or crew of LPG/C GASCHEM NORDSEE were negligent in LPG/C GASCHEM NORDSEE's navigation before and at the time of this incident, and such negligence caused the allision and the related damages to Advansix arising from the allision. Such negligence was the proximate cause of the allision and the related damages arising from the allision.

## IV. PRAYER

WHEREFORE, AdvanSix prays:

(1) That due process in the form of law, according to the course and practice of this Honorable Court in causes of admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, issue against the GASCHEM NORDSEE Interests, citing them to appear and answer the foregoing, failing which a default will be taken against them for the principal amount of the claim, plus interest, costs, and attorney's fees;

(2) That Intervening-Plaintiff Advansix have judgment entered in its favor against the GASCHEM NORDSEE Interests on the cause of action specified for the amount of Advansix's damages, to be proven at trial,

together with interests, costs, and disbursements of this action and attorney's fees;

(3) That the Court grant such other, further, and different relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Kevin P. Walters*

Kevin P. Walters
Texas State Bar No. 20818000
Federal I.D. No. 5649
Dimitri P. Georgantas
Texas State Bar No. 070805100
Federal I.D. No. 2805
ROYSTON, RAYZOR, VICKERY & WILLIAMS, LLP
1600 Smith Street, Suite 5000
Houston, Texas 77002-7380
Telephone: (713) 224-8380
Facsimile: (713) 225-9545
kevin.walters@roystonlaw.com
dimitri.georgantas@roystonlaw.com

**ATTORNEYS FOR INTERVENOR PLAINTIFF ADVANSIX INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 26th day of August, 2022, I served a true and correct copy of the foregoing via electronic mail, facsimile transmission, personal delivery, and/or by placing a copy of same in the U.S. mail, postage prepaid and properly addressed on the following known counsel of record:

/s/ *Kevin P. Walters*
Kevin P. Walters



EXHIBIT
A

Code word for this Charter Party
"SHELLTIME 4"

Issued December 1984 amended December 2003, Version 1.1 Apr06

# Time Charter Party
October 27th, 2020

IT IS THIS DAY AGREED between Seabulk Challenge, LLC ________(hereinafter referred to as "Owners"), being owners of the U.S.-flag good motor vessel called Seabulk Challange, Official Number 642151 (hereinafter referred to as "the vessel") described as per Clause 1 hereof and AdvanSix Inc. (hereinafter referred to as "Charterers"):

**Description And Condition of Vessel**

1. At the date of delivery of the vessel under this Charter and throughout the charter period, Owners covenant, insofar as can be obtained by due diligence:
   (a) she shall be classed by The American Bureau of Shipping a Classification Society;
   (b) she shall be in every way fit to carry clean petroleum products and chemicals always provided such cargoes are authorized to be carried per the vessel's USCG Certificate of Inspection and ABS List of Authorized Cargoes;
      (i) The maximum amount of cargo grades to be carried is five (5) and always within vessel s natural segregations;
   (c) she shall be tight, staunch, strong, in good order and condition, and in every way fit for the service, with her machinery, boilers, hull and other equipment (including but not limited to, radar, computers and computer systems) in a good and efficient state;
   (d) her tanks, valves and pipelines shall be oil-tight;
   (e) she shall be in every way fitted for burning, in accordance with the grades specified in Clause 29 hereof:
      (i) at sea, marine diesel oil for main propulsion and marine diesel oil for auxiliaries;
      (ii) in port, marine diesel oil for auxiliaries;
   (f) (reserved)
   (g) she shall have on board all certificates, documents and equipment required from time to time by any applicable law to enable her to perform the charter service without delay;
   (h) she shall comply with the description in the OCIMF Harmonised Vessel Particulars Questionnaire (to be appended hereto as Appendix A prior to delivery of the vessel), provided however that if there is any conflict between the provisions of this questionnaire and any other provision, including this Clause 1, of this Charter such other provisions shall govern;
   (i) her flag, registry, classification society and management company shall not be changed and she shall, during the term of this Charter, remain documented under the U.S. flag with a coastwise endorsement under 46 U.S.C. Chapter 121, as amended from time to time;

**Safety Management**

   (j) Owners will operate:
      (i) a safety management system certified to comply with the International Safety Management Code ("ISM CODE") for the Safe Operation of Ships and for Pollution Prevention;
      (ii) a documented safe working procedures system (including procedures for the identification and mitigation of risks);
      (iii) an environmental management system to the extent required by the ISM Code;
      (iv) documented accident/incident reporting system compliant with flag state requirements;
   (k) The owners shall promptly provide the charterers with written notice of any marine casualty (as such term is used in the regulations of the U.S. Coast Guard) with respect to the vessel, any discharge of any reportable quantity under applicable law of oil or hazardous materials from the vessel, and any detention of the vessel by the U.S. Coast Guard, in each case that occurs during the term of this Charter.

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document.

(l) Owners shall maintain Health Safety Environmental ("HSE") records sufficient to demonstrate compliance with the requirements of their HSE system and of this Charter. Charterers reserve the right to confirm compliance with HSE requirements by audit of Owners.

(m) If requested by Charterers for cargo carriage, Owners will arrange at their expense for a SIRE inspection to be carried out at intervals of six months plus or minus thirty days. Owners will arrange at their expense for a CDI inspection to be carried out at intervals of twelve months plus or minus thirty days. If vessel fails any such SIRE or CDI inspection due to deficient operating practices or maintenance of equipment, and such failure prevents the vessel from performing normal commercial operations then parties agree to treat such suspension of commercial operations as an unplanned offhire event which shall be covered by Additional Clause 7.

**Shipboard Personnel And their Duties**

2. (a) At the date of delivery of the vessel under this Charter and throughout the duration of this charter period, Owners covenant, insofar as can be obtained by the exercise of due diligence:

(i) she shall have a full and efficient complement of master, officers and crew for a vessel of her tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be trained to operate the vessel and her equipment competently and safely;

(ii) all shipboard personnel shall hold valid certificates of competence in accordance with the requirements of the law of the flag state;

(iii) all shipboard personnel shall be trained in accordance with the relevant provisions of the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978, as amended in 1995, or any applicable additions, modifications or subsequent versions thereof;

(iv) there shall be on board sufficient personnel with a good working knowledge of the English language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and to enable communications between the vessel and those loading the vessel or accepting discharge there from to be carried out quickly and efficiently;

(b) Owners guarantee that throughout the charter period the master shall with the vessel's officers and crew, unless otherwise ordered by Charterers:

(i) prosecute all voyages with the utmost dispatch;

(ii) render all customary assistance; and

(iii) load and discharge cargo as rapidly as possible when required by Charterers or their agents to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the case may be) and in each case in accordance with any applicable laws of the United States.

**Duty to Maintain**

3. (a) Throughout the charter period Owners shall, whenever the passage of time, wear and tear or any event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.

(b) If at any time whilst the vessel is on hire under this Charter the vessel fails to comply with the requirements of Clauses 1, 2(a) or 10 then hire shall be reduced to the extent reasonably necessary to compensate Charterers for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services under this Charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time so lost.
Any reduction of hire under this sub-Clause (b) shall be without prejudice to any other remedy available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded from any calculation under Additional Clause 3.

(c) If Owners are in breach of their obligations under Clause 3(a), Charterers may so notify Owners in writing and if, after the expiry of 30 days following the receipt by Owners of any such notice,

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document.

Owners have failed to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(a), the vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they are exercising such due diligence.

(d) Owners shall advise Charterers immediately, in writing, should the vessel fail an inspection by, a governmental and/or port state authority, and/or terminal. Owners shall simultaneously advise Charterers of their proposed course of action to remedy the defects which have caused the failure of such inspection.

(e) If-vessel is prevented from normal commercial operations due to either:
(i) failure of an inspection by a governmental and/or port state authority, or,
(ii) any finding of an inspection by a governmental and/or port state authority,
then Charterers have the option to place the vessel off-hire from the date and time that the vessel becomes commercially inoperable, until the date and time that the vessel passes a re-inspection by the same organisation, or becomes commercially operable, which shall be in a position no less favourable to Charterers than at which she went off-hire.

(f) Furthermore, if the vessel is off-hire for more than thirty-five (35) consecutive days (excluding any time for scheduled intermediate and/or special surveys) under this Clause 3 (with the exception of Clause 3(e)(ii)), unless such off-hire is caused predominantly by Charterers and/or Charterers agents, Charterers have the option to terminate this Charter by giving notice in writing

with effect from the date on which such notice of termination is received by Owners or from any later date stated in such notice. This sub-Clause (f) is without prejudice to any rights or obligations of Charterers or Owners under this Charter or otherwise (including without limitation Charterers' rights under Clause 21 hereof). Charterers right to terminate this Charter as provided within this Clause 3(f) shall not apply until the vessel is off hire for more than thirty-five (35) consecutive days (excluding any time for scheduled intermediate and/or special surveys.)

Period, Trading Limits and Safe Places

4. (a) Owners agree to let and Charterers agree to hire the vessel for a period of about two (2) years and ten (10) months (the "charter period").
The charter period shall commence from the time and date of delivery of the vessel, within the laycan as specified in Clause 5 of this Charter, for the purpose of carrying all lawful merchandise (subject always to Clause 28) including in particular clean petroleum products and chemicals in accordance with Clause 1(b), and end not earlier than April 5, 2024 and not later than May 5, 2024. Regardless of the foregoing, the Vessel shall redeliver prior to regulatory dry-docking due in **2024** or earlier if regulations so require. Trade limits are strictly within U.S. Gulf Coast (including Florida), U.S. Atlantic Coast, subject to the limits of the current American Institute Trade Warranties and any subsequent amendments thereof. The vessel shall not be required to force ice. Any other trading locations shall be mutually agreed, always excluding Alaska, South America, Central America, Cuba and any countries or ports prohibited by the U.S. Government, between Owners and Charterers. Should the vessel trade outside the United States domestic trade, all increases in insurance premiums shall be for Charterers' account.

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document

~~(b)~~

(c) Charterers shall use due diligence, with Owners verification, to ensure that the vessel is only employed between and at safe places (which expression when used in this Charter shall include ports, berths, wharves, docks, anchorages, submarine lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always afloat. Notwithstanding anything contained in this or any other clause of this Charter, Charterers do not warrant the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for loss or damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be loaded and discharged at any places as Charterers may direct, provided that

Charterers shall exercise due diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition of the ICS/OCIMF Ship-to-Ship Transfer Guide.

(d) Unless otherwise agreed, the vessel shall be delivered by Owners free of cargo and cargo slops upon arrival at the sea bouy at a port in the U.S. Gulf Coast at Charterers option and redelivered free of cargo and cargo slops to Owners upon arrival at the sea bouy at a port in

the U.S. Gulf Coast, at Charterers' option. Charterers are to declare delivery location 15 days prior delivery range in Clause 5 of this Charter.

(e) The vessel will deliver with cargo tanks suitable to load products in accordance with Clause 1(b).

(f) Owners are required to give Charterers 30/25/20/15/10/7 days approximate notice and 5/3/1 days definite notice of delivery and Charterers are required to give Owners 30/20/10 days approximate notice and 7/5/3/1 days definite notice of redelivery.

5. See Additional Clause 4.

Laydays/ Cancelling

Owners to Provide

6. Owners undertake to provide and to pay for all provisions, wages (including but not limited to all overtime payments), and shipping and discharging fees and all other expenses of the master, officers and crew; also, except as provided in Clauses 4 and 34 hereof, for all insurance on the vessel, for all deck, cabin and engine-room stores, and for water; for all drydocking, overhaul, maintenance and repairs to the vessel; and for all fumigation expenses and de-rat certificates. Owners' obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the performance of this Charter in relation to the personal effects of the master, officers and crew, and in relation to the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire. At Charterer expense, Owner shall provide and pay for all towage and pilotage and shall pay all agency fees, port charges, and canal dues with respect to the vessel during the charter period. Charterer shall reimburse Owner for the costs and services described in the foregoing sentence at cost paid (inclusive of any discount received by Owner) in accordance with the procedures set forth in Clause 9 of this Charter. Charterers acknowledge that the vessel will require provisioning, engine room waste oil disposal and crew changes periodically during the charter period (the "Services"). Charterers agree to make reasonable efforts to allow the vessel to perform any of the Services while the vessel is alongside load and/or discharge terminals, including

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document.

lowing the use of a deck barge (or other similar vessel). If terminals do not allow any of the Services to be performed while the vessel is alongside, and such Services have not been performed for a period of more than sixty (60) consecutive days, then Owners, with reasonable notice given to Charterers, shall be permitted to arrange the Services at a lay-berth. Owners shall be responsible for the cost of the barge and/or lay-berth used for the Services. However, Charterers shall be responsible for all reasonable and direct shifting expenses (if any) and for all time consumed while the Services are being performed, provided such time does not exceed sixteen (16) hours aggregate.

Charterers to Provide

7. (a) Charterers shall provide and pay for all fuel, commissions, expenses of loading and unloading cargoes, removal of all cargo slops, canal dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for Owners' purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or distance made good and taken into account under Clause 21 or 22); and provided further that any fuel used in connection with a general average sacrifice or expenditure shall be paid for by Owners. In respect of bunkers consumed for Owners' purposes these will be charged on each occasion by Charterers on a "first-in-first-out" basis valued on the prices actually paid by Charterers.

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document

(b) If the trading limits of this Charter include ports in the United States of America and/or its protectorates then Charterers shall reimburse Owners for all port specific charges when incurred by the vessel calling at ports in the United States of America and/or its protectorates in accordance with Charterers' orders. All taxes and/or dues on cargo are for Charterers' account.

Rate of Hire

8. Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of United States Dollars [redacted] for the first year; [redacted] for the second year and [redacted] for the third year per day, and pro rata for any part of a day, from the time and date of her delivery (local time) to Charterers until the time and date of redelivery (local time) to Owners. Annually on the anniversary of the Vessel's date of delivery, the Rate of Hire shall be adjusted in accordance with the aforementioned rates for the first year, second year and third year

Payment of Hire

9. Subject to Clause 3 (c) and 3 (e), payment of hire shall be made in immediately available funds, free of bank charges, payable on or before the due date either by wire transfer or ACH at Charterers' option to a bank account to be designated in writing by Owners prior to delivery of the vessel,

in United States Dollars per calendar month within 45 days of invoice date, less:

(i) any hire paid which Charterers reasonably estimate to relate to off-hire periods, and;

(ii) any amounts disbursed on Owners' behalf, any advances and commission thereon, and charges which are for Owners' account pursuant to any provision hereof, and;

(iii) any amounts due or reasonably estimated to become due to Charterers under Clause 3 (b) or Additional Clause 3 hereof,

any such adjustments to be made at the due date for the next monthly payment after the facts have been ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners' account provided that Charterers have made proper and timely payment.

In default of such proper and timely payment:

(a) Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of such notice pay to Owners the amount due, including interest, failing which Owners may withdraw the vessel from the service of Charterers without prejudice to any other rights Owners may have under this Charter or otherwise.

Space Available to Charterers

10. The whole reach, burthen and decks on the vessel shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores.

Segregated Ballast

11. In connection with the Council of the European Union Regulation on the Implementation of IMO Resolution A747(18) Owners will ensure that the following entry is made on the International Tonnage Certificate (1969) under the section headed "remarks":

"The segregated ballast tanks comply with the Regulation 13 of Annex 1 of the International Convention for the prevention of pollution from ships, 1973, as modified by the Protocol of 1978 relating thereto, and the total tonnage of such tanks exclusively used for the carriage of segregated water ballast is **7929.** The reduced gross tonnage which should be used for the calculation of tonnage based fees is **21894**.

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document.

Code word for this Charter Party
"SHELLTIME 4"

Issued December 1984 amended December 2003, Version 1.1 Apr06

Instructions And Logs

12. Charterers shall from time to time give the master all requisite instructions and sailing directions, and the master shall keep a full and, correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master.

Bills of Lading

13. Charterers shall not issue Bills of Lading for United States domestic voyages. To the extent that Bills of Lading are issued for either United States domestic voyages or mutually agreed international voyages then the following shall apply, however in the absence of Bills of Lading the terms of this Charter will apply to any carriage.

(a) The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign Bills of Lading as Charterers or their agents may direct (subject always to Clauses 35 (a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners by providing Owners a Letter of Indemnity acceptable to Owners against all consequences or liabilities that may arise;

(i) from signing Bills of Lading in accordance with the directions of Charterers or their agents, to the extent that the terms of such Bills of Lading fail to conform to the requirements of this Charter, or (except as provided in Clause 13 (b) from the master otherwise complying with Charterers' or their agents' orders;

(ii) from any inconsistency between this Charter and any Bills of Lading or other documents signed by the Charterers or their agents or by the Master at Charterers request or which may arise from any irregularities in papers supplied by Charterers or their agents.

(b) If Charterers by telex, facsimile or other form of written communication that specifically refers to this Clause request Owners to discharge a quantity of cargo either without Bills of Lading and/or at a discharge place other than that named in a Bill of Lading and/or that is different from the Bill of Lading quantity, then Owners shall discharge such cargo in accordance with

Charterers' instructions in consideration of receiving from Charterers a Letter of Indemnity acceptable to Owners and the following indemnity which shall be deemed to be given by Charterers on each and every such occasion;

(i) Charterers shall indemnify Owners and Owners' servants and agents in respect of any liability loss or damage of whatsoever nature (including any and all legal costs as between attorney or solicitor and client and associated expenses) which Owners may sustain by reason of delivering such cargo in accordance with Charterers' request.

(ii) If any proceeding is commenced against Owners or any of Owners' servants or agents in connection with the vessel having delivered cargo in accordance with such request, Charterers shall provide Owners or any of Owners' servants or agents from time to time on demand with sufficient funds to defend the said proceedings.

(iii) If the vessel or any other vessel or property belonging to Owners should be arrested or detained, or if the arrest or detention thereof should be threatened, by reason of discharge in accordance with Charterers instruction as aforesaid, Charterers shall provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such vessel or property and Charterers shall indemnify Owners in respect of any loss, damage or expenses caused by such arrest or detention whether or not same may be justified.

(iv) Charterers shall, if called upon to do so at any time while such cargo is in Charterers' possession, custody or control, redeliver the same to Owners.

(v) As soon as all original Bills of Lading for the above cargo which name as discharge port the place where delivery actually occurred shall have arrived and/or come into Charterers' possession, Charterers shall produce and deliver the same to Owners whereupon Charterers' liability hereunder shall cease.

~~(a)~~
~~(b)~~

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) ...

Termination of this indemnity shall not prejudice any legal rights a party may have outside this indemnity.

(vi) Owners shall promptly notify Charterers if any person (other than a person to whom Charterers ordered cargo to be delivered) claims to be entitled to such cargo and/or if the vessel or any other property belonging to Owners is arrested by reason of any such discharge of cargo.

(vii) This indemnity shall be governed and construed in accordance with the federal general maritime laws of the United States of America and, to the extent such laws are inapplicable, the laws of the State of New York (without reference to its conflicts of law principles), and each and any dispute arising out of or in connection with this indemnity shall be subject to Clause 46 of this Charter.

(c) Owners warrant that the Master will comply with orders to carry and discharge against an original negotiable Bill of Lading should Charterers so require.

**Conduct of Vessel's Personnel**

14. If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible.

**Bunkers at Delivery and Redelivery**

15. Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on redelivery (whether it occurs at the end of the charter or on the earlier termination of this Charter) accept and pay for all bunkers remaining onboard, at the price actually paid, on a first-in-first-out basis. Such prices are to be supported by actual paid invoices. Vessel to be delivered to the Charterers with at least a quantity of bunkers on board sufficient to reach the nearest main bunkering port and redelivered from the Charterers with at least a quantity of bunkers on board sufficient to reach the nearest main bunkering port.

Notwithstanding anything contained in this Charter all bunkers on board the vessel shall, throughout the duration of this Charter, remain the property of Charterers and can only be purchased on the terms specified in this Charter at the end of the charter period or, if earlier, at the termination of this Charter.

**Stevedores, Pilots, Tugs**

16. Stevedores, when required, shall be engaged and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the engagement of pilots or, tugboats or stevedores, who although engaged by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact the servants of Charterers, their agents or any affiliated company); provided, however, that:

a. the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves engaged such pilots, tugboats or stevedores, and;

b. Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores.

**Super-Numeraries**

17. Charterers may send their employees or representatives in the vessel's available accommodation upon any voyage made under this Charter, Owners finding provisions and all requisites as supplied to officers, except alcohol. Charterers paying at the rate of United States Dollars fifty ($50.00) per day for each employee or representative while on board the vessel. Charterers' employees and/or representatives shall sign Owners' form of indemnity/release letter prior to boarding the vessel.

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document.

Code word for this Charter Party
"SHELLTIME 4"

Issued December 1984 amended December 2003, Version 1.1 Apr06

Sub-letting/ Assignment/ Novation

18. Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this Charter. However, Charterers may not sub-let the vessel to an entity or person whose business includes, in whole or in part, commercial management and/or technical management and/or ownership (including disponent ownership) of vessels that transport oil or chemical commodities including but not limited to Bouchard, Crowley, OSG, US Shipping, Moran and American Petroleum Tankers. For the avoidance or doubt, the foregoing sub-let restriction does not apply to refining companies, commodity trading companies and the Oil Majors including but not limited to Valero, CITGO, Morgan Stanley, BP, Chevron and ExxonMobil.

Final Voyage

19. If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct amounts due or reasonably expected to become due for;

(a) disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and;

b) bunkers on board at redelivery pursuant to Clause 15.

Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by Charterers.

If at the time this Charter would otherwise terminate in accordance with Clause 4 the vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by this Charter, as the case may be.

20. Should the vessel be lost, missing or become an actual agreed, arranged, compromised or constructive total loss, Owners will have the option of substituting another vessel with similar characteristics as the vessel to Charterers at a rate equivalent to the current vessel's Rate of Hire or terminating this Charter. There shall be no hire paid for any period in between the loss of the vessel and delivery of the substitute vessel, if any. If this Charter is terminated, then hire shall cease at noon on the day of her loss.

Any hire paid in advance and not earned by the lost vessel shall be applied to the replacement vessel or returned to Charterers if Owners terminate this Charter
and Owners shall reimburse Charterers for the value of the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port.

Off-hire

21. (a) On each and every occasion that there is loss of time (whether by way of interruption in the vessel's service or, from reduction in the vessel's performance, or in any other manner);

(i) Due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel; stowaway or any other similar cause preventing the efficient working of the vessel; and such loss continues for more than five (5) consecutive hours (if resulting from interruption in the vessel's service) or cumulates to more than five (5) hours (if resulting from partial loss of service from the same cause); or;

(ii) Due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew; or;

(iii) for the purpose of obtaining medical advice or treatment for or landing any sick or injured person (other than a Charterers' employee or representative carried under Clause 17 hereof) or for the purpose of landing the body of any person (other than a Charterers' employee or representative), and such loss continues for more than five (5) consecutive hours; or;

(iv) due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers, or crew; or;

(v) due to detention of the vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the vessel, the vessel's Owners

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document.

(unless brought about by the act or neglect of Charterers); then without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder, or otherwise, the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.

(b) If the vessel fails to proceed at any guaranteed speed pursuant to Additional Clause 3, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire under this Clause 21 shall be the difference between;

(i) the time the vessel would have required to perform the relevant service at such guaranteed speed, and;

(ii) the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service).

For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Additional Clause 3.

(c) Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a position not less favorable to Charterers than that at which the deviation commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and payable during any time lost thereby, and the port charges, pilotage and other expenses at such port shall be borne by the Charterers.

~~(d)~~

(e) Time during which the vessel is off-hire under this Charter shall count as part of the charter period except where Charterers declare their option to add off-hire periods under Clause 4 (b).

(f) All references to "time" in this Charter shall be references to local time except where otherwise stated.

**Periodical Drydocking**

22 (a) Owners have the right and obligation to drydock the vessel at regular intervals as required by the vessel's flag state and /or Classification Society.

On each such occasion Owners shall propose to Charterers a fifteen (15) day date range within which they wish to begin drydock of the vessel, not less than sixty (60) days before the first day of such range, and Charterers shall make the vessel available as near to such dates as practicable.

Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any Bill of Lading or this Charter.

~~(b)~~ (reserved)

~~(i)~~

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document.

~~(ii)~~

(c) The vessel shall be off-hire from the time when she is released to proceed to the drydock port until she next presents for loading in accordance with Charterers' instructions, or in the absence of Charterers' instructions, upon arrival at the customary load port after completion of dry-docking, provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any benefit they may gain in purchasing bunkers at the drydock port.

(d) Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of tank-cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers calculate to have been saved thereby.

Ship Inspection

23. Upon reasonable prior written notice to Owners, Charterers shall have the right at any time during the charter period to make such inspection of the vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute discretion may determine and whether the vessel is in port or on passage,. Owners affording all necessary co-operation and accommodation on board provided, however:

(a) that neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase Charterers' responsibilities to Owners or third parties for the same; and;

(b) that Charterers shall not be liable for any act, neglect or default by themselves, their servants or agents in the exercise or non-exercise of the aforesaid right;

(c) that any cost incurred by Owners by such inspection shall be for Charterers account;

(d) that any inspection carried out by the Charterers shall be made without interference with or hindrance to the vessel's safe and efficient operation, and shall be limited to a maximum number of people at the Masters discretion always keeping in mind safe vessel operations; and

(e) that any overnight stays shall be subject to Clause 17.

~~Detailed Description and Performance~~

24. (deleted; see Additional Clause 3)

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document.

Salvage 25. Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of services rendered under this Clause 25.
All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers after deducting the master's, officers' and crew's share.

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document.

Code word for this Charter Party
"SHELLTIME 4"

Issued December 1984 amended December 2003, Version 1.1 Apr06

Lien

26. For cargo carried during a period where the undisputed hire or any other amounts due under this Charter is outstanding past the due date and after expiration of the cure period as provided in Clause 9, Owners shall have a lien upon the cargo for the shipment at issue until payment is received, and Owners shall have a lien upon all freights, sub-freights and demurrage for any amounts due under this Charter. -Charterers shall have a lien on the vessel for all monies paid in advance and not earned, and for all claims for damages arising from any breach by Owners of this Charter. Notwithstanding the terms of Clause 46 herein, Owners and Charterers may pursue their in rem rights in any jurisdiction where the property subject to such rights may be found, provided that, the parties agree to then seek a transfer of such action to the jurisdiction and venue selected in Clause 46.

Exception

27. (a) The vessel, her master and Owners shall not, unless otherwise in this Charter expressly provided, be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, mariners or other servants of Owners in the navigation or management of the vessel; fire, unless caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however, that Clauses 1, 2, 3 and Additional Clause 3 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or Owners, nor Charterers shall, unless otherwise in this Charter expressly provided, be liable for any loss or damage or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or restraint of princes, rulers or people. For the avoidance of doubt, the foregoing sentence shall not include any modification, waiver or repeal of the coastwise trade laws of the United States of America that are principally contained in 46 U.S.C. Chapters 121 and 551 and commonly called the "Jones Act," and any such modification, waiver or repeal shall not excuse performance by Charterers or Owners of any of their obligations under this Charter.

(b) The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress and to deviate for the purpose of saving life or property.

(c) Clause 27(a) shall not apply to, or affect any liability of Owners or the vessel or any other relevant person in respect of;

(i) loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane or other works or equipment whatsoever at or near any place to which the vessel may proceed under this Charter, whether or not such works or equipment belong to Charterers, or;

(ii) any claim (whether brought by Charterers or any other person) arising out of any loss of or damage to or in connection with cargo. Any such claim shall be subject to the U.S. Carriage of Goods by Sea Act, 1936, as amended from time to time, or the Hague-Visby Rules or the Hague Rules or the Hamburg Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant Bill of Lading (whether or not such Rules were so incorporated) or, if no such Bill of Lading is issued, to the U.S. Carriage of Goods by Sea Act, 1936, unless such other Rules compulsorily apply according to governing legislation in the country in which the Bill Lading was issued, in which case to such other Rules.

(d) In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this Charter relating to off-hire or to reduction of hire.

Injurious Cargoes

28.

Owners shall have the right to refuse to carry any cargos that Owners determine to be injurious to vessel based on reasonable scientific and/or chemical justification. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments.

Grade of Bunkers

29. (a) Charterers shall supply marine diesel oil with a maximum viscosity of 12 centistokes at 50 degrees centigrade for main propulsion and the auxiliaries.

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document.

Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality complying with ISO Standard 8217:2010, or any subsequent amendments thereof, for Marine Residual Fuels and Marine Distillate Fuels as applicable.

(b) Notwithstanding the foregoing, the Charterers shall supply fuels that are of a stable and homogeneous nature and suitable for burning in the vessel s engines and/or auxiliaries and, unless otherwise agreed in writing, shall comply with ISO standard 8217:2010 or any subsequent amendments thereof. A fuel sample shall be drawn in accordance with IMO Resolution MEPC.96(47) Guidelines for the Sampling of Fuel Oil for Determination of Compliance with Annex VI of MARPOL 73/78 or any subsequent amendments thereof, which is to be sent to Owners nominated surveyor whose analysis as regards to the characteristics of the fuel shall be binding on the parties concerning the tested characteristics. The Charterers shall be liable for any loss or damage to the Owners and/or the vessel caused by the supply of unsuitable fuels and/or fuels which do not comply with the specifications and/or grades set out in this Clause 29 including, without limitation, the off-loading of unsuitable bunkers and the supply of fresh bunkers to the vessel. The Owners shall not be held liable for any reduction in the Vessel's speed performance, increased bunker consumption, any time lost nor any other consequences arising as a result of such fuel supply.

~~Disbursements~~

**Laying-up**

31. Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should reasonably be made by Owners as a result of such lay up. Charterers may exercise the said option any number of times during the charter period.

**Requisition**

32. Should the vessel be requisitioned by any government, de facto or de jure, during the period of this Charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such government in respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of the charter period.

**Outbreak of War**

33. If war or hostilities break out between any two or more of the following countries and results in the implementation of the Automatic Termination clause of the Owners' insurance policies: U.S.A., the

Russian Federation, People's Republic of China, U.K., and France, then both Owners and Charterers shall have the right to cancel this Charter.

**Additional War Expenses**

34. If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, or in areas listed in the most current Joint War Committee Hull War, Piracy, Terrorism and Related Perils Listed areas, Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of such expenses as soon as practicable, and provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under their war risk insurance arising out of compliance with such orders.

Any payments by Charterers under this clause will only be made against proven documentation. Any discount or rebate refunded to Owners, for whatever reason, in respect of additional war risk premium shall be passed on to Charterers.

**War Risks**

35. (a) The master shall not be required or bound to sign Bills of Lading for any place which in his or Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, war, hostilities, warlike operations, civil war, civil commotions, piracy, terrorism or revolutions.

(b) If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this Charter (a "place of peril"), then Charterers or their agents shall be immediately notified in writing (including by email) or by radio messages, and Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or discharged, as the case may be, at any other place within the trading limits of this Charter

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document.

(provided such other place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been received from Charterers or their agents within 24 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in their or his discretion select within the trading limits of this Charter and such discharge shall be deemed to be due fulfilment of Owners' obligations under this Charter so far as cargo so discharged is concerned.

(c) The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever given by the government of the state under whose flag the vessel sails or any other government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or is not done, such shall not be deemed a deviation. If by reason of or in compliance with any such direction or recommendation the vessel does not proceed to any place of discharge to which she has been ordered pursuant to this Charter, the vessel may proceed to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners' obligations under this Charter so far as cargo so discharged is concerned.

Charterers shall procure that all Bills of Lading issued under this Charter shall incorporate the CONWARTIME 2013 Clause. For the avoidance of doubt Owners and Charterers agreed that Clause a(ii)(e) of CONWARTIME 2013 shall allow for payments to be due forty five (45) days from invoice date.

Both to Blame Collision Clause

36. If the liability for any collision in which the vessel is involved while performing this Charter falls to be determined in accordance with the laws of the United States of America, the following provision shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier."

"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact."

Charterers shall procure that all Bills of Lading issued under this Charter shall contain a provision in the foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be determined in accordance with the laws of the United States of America. in the foregoing provision shall include Owners.

New Jason Clause

37. General average contributions shall be payable according to York/Antwerp Rules, 1994, as amended from time to time, and shall be adjusted in New York in accordance with United States law (specifically, the federal general maritime laws of the United States of America and, to the extent such laws are inapplicable, the laws of the State of New York (without reference to its conflicts of law principles)) and practice and the following provision shall apply:

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document.

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo."
"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery."
Charterers shall procure that all Bills of Lading issued under this Charter shall contain a provision in the foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and practice of the United States of America. The word "carrier" as used in the foregoing provision shall include Owners.

Clause Paramount

38. This Charter is subject to the provisions of the U.S. Carriage of Goods by Sea Act, 1936, as amended from time to time, and to the remainder of this Clause 38. Charterers shall procure that all Bills of Lading issued pursuant to this Charter shall contain the following clause:

"(1)Subject to sub-clause (2) or (3) hereof, this Bill of Lading shall be governed by, and have effect subject to, the U.S. Carriage of Goods by Sea Act, 1936, as amended from time to time.

Nothing contained herein shall be deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his responsibilities or liabilities under the U.S. Carriage of Goods by Sea Act, 1936, as amended from time to time."
"(2) If there is governing legislation in the country in which the Bill of Lading was issued that applies the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August 1924 (hereinafter the "Hague Rules") or the Hague Rules as amended by the Protocol signed at Brussels on 23rd February 1968 (hereinafter the "Hague-Visby Rules") compulsorily to this Bill of Lading, to the exclusion of the U.S. Carriage of Goods by Sea Act, 1936, then this Bill of Lading shall have effect subject to the Hague Rules or the Hague-Visby Rules, as the case may be. Nothing therein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the U.S. Carriage by Goods of Sea, 1936, the Hague Rules or the Hague-Visby Rules."
(3) If there is governing legislation which applies the United Nations Convention on the Carriage of Goods by Sea 1978 (hereafter the "Hamburg Rules") compulsorily to this Bill of Lading, to the exclusion of the U.S. Carriage by Goods of Sea Act, 1936, then this Bill of Lading shall have effect subject to the Hamburg Rules. Nothing therein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the U.S. Carriage by Goods of Sea Act, 1936 or the Hamburg Rules."
"(4) If any term of this Bill of Lading is repugnant to the U.S. Carriage by Goods of Sea Act, 1936, or the Hague Rules, the Hague-Visby Rules, or the Hamburg Rules, if applicable, such term shall be void to that extent but no further."
"(5) Nothing in this Bill of Lading shall be construed as in any way restricting, excluding or waiving the right of any relevant party or person to limit his liability under any available legislation and/or law."

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document.

Code word for this Charter Party
"SHELLTIME 4"

Issued December 1984 amended December 2003, Version 1.1 Apr06

**Insurance / ITOPF**

39. Owners warrant that the vessel is now, and will, throughout the duration of this Charter:
(a) be owned or demise chartered by a member of the International Tanker Owners Pollution Federation Limited;
(b) be properly entered in The Steamship Mutual Underwriting Association Limited P & I Club, being a member of the International Group of P and I Clubs, or another member of the International Group of P & I Clubs;
(c) have in place insurance cover for oil pollution for the maximum on offer through the International Group of P&I Clubs (currently United States Dollars 1,000,000,000 (one billion));
(d) have in full force and effect Hull and Machinery insurance for an amount not less than the reasonable market value of the vessel, placed through reputable brokers on
on Institute Time Clauses or equivalent and for Owners and their Hull and Machinery insurers' agreed value of the vessel.

Owners will provide, within a reasonable time following a request from Charterers to do so, documented evidence of compliance with the warranties given in this Clause 39.

**Export Restrictions**

40. The master shall not be required or bound to sign Bills of Lading for the carriage of cargo to any place to which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was produced and/or shipped.
Charterers shall procure that all Bills of Lading issued under this Charter shall contain the following clause:
"If any laws, rules or regulations applied by the government of the country in which the cargo was produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo to the place of discharge designated in or ordered under this Bill of Lading, carriers shall be entitled to require cargo owners forthwith to nominate an alternative discharge place for the discharge of the cargo, or such part of it as may be affected, which alternative place shall not be subject to the prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72 hours after they or their agents have received from carriers notice of such prohibition, carriers shall be at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place on which they or the master may in their or his absolute discretion decide and which is not subject to the prohibition, and such discharge shall constitute due performance of the contract contained in this Bill of Lading so far as the cargo so discharged is concerned".
The foregoing provision shall apply mutatis mutandis to this Charter, the references to a Bill of Lading being deemed to be references to this Charter. The word "carrier" as used in the foregoing provision shall include Owners.

~~**Business Principles**~~

~~41.~~

**Drugs and Alcohol**

42.

Owners warrant that they have in force an active policy covering the vessel which meets or exceeds the standards set forth the "Guidelines for the Control of Drugs and Alcohol on Board Ship" as published by the Oil Companies International Marine Forum (OCIMF) dated June 1995 (or any subsequent modification, version, or variation of these guidelines which includes that no illegal drugs or alcohol shall be allowed on board) and that this policy will remain in force throughout the charter period, and Owners will exercise due diligence to ensure compliance with this policy.

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no

~~Oil Major Acceptability~~

43. See Clause 1(m) of this Charter.

Pollution and Emergency Response

44. Owners are to advise Charterers of organizational details and names of Owners personnel together with their relevant telephone/facsimile/e-mail/telex numbers, including the names and contact details of Qualified Individuals for OPA 90 response, who may be contacted on a 24 hour basis in the event of oil spills or emergencies.

ISPS Code / US MTSA 2

45. (a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) and the US Maritime Transportation Security Act 2002 (MTSA) in relation to the vessel and thereafter during the currency of this Charter, Owners shall procure that both the vessel and "the Company" (as defined by the ISPS Code) and the "owner" (as defined by the MTSA) shall comply with the requirements of the ISPS Code relating to the vessel and "the Company" and the requirements of MTSA relating to the vessel and the "owner". Upon request, Owners shall provide documentary evidence of compliance with this Clause 45(a) (i).

(ii) Except as otherwise provided in this Charter, loss, damage, expense or delay, caused by failure on the part of Owners or "the Company"/"owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for Owners' account.

(b) (i) Charterers shall provide Owners/Master with their full style contact details and shall ensure that the contact details of all sub-charterers are likewise provided to Owners/Master. Furthermore, Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter contain the following provision:
"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter, loss, damage, expense or delay, caused by failure on the part of Charterers to comply with this sub-Clause 45(b) shall be for Charterers' account.

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document.

(c) Notwithstanding anything else contained in this Charter costs or expenses related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for Charterers' account, unless such costs or expenses result solely from Owners' negligence in which case such costs or expenses shall be for Owners' account. All measures required by Owners to comply with the vessel security plan required by the ISPS Code/MTSA shall be for Owners' account.

(d) Notwithstanding any other provision of this Charter, the vessel shall not be off-hire where there Is a loss of time caused by Charterers' failure to comply with the ISPS Code/MTSA(when in force).

(e) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

Law and Litigation — 46. *Lines 775 – 800 removed*

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no

**CHOICE OF LAW AND FORUM; CONSENT TO JURISDICTION; SERVICE OF PROCESS; WAIVER OF JURY TRIAL.**

(a) Choice of Law. This Charter, as it is maritime in nature, shall be governed by and construed in accordance with the general maritime law of the United States of America excluding any conflicts of laws principles that would direct the substantive law of another jurisdiction to apply and, to the extent that such general maritime law is inapplicable, the laws of the State of New York, excluding any conflicts of laws principles that would direct the law of another jurisdiction to apply.

(b) Arbitration

(1) All disputes between the parties hereto concerning or arising out of the construction, interpretation, effect, or alleged breach of this Charter, or the rights and liabilities of the parties, shall be settled by arbitration in the City of New York. The party requesting arbitration shall serve upon the other party prompt written demand for arbitration. Such demand shall specify the name and address of the arbitrator appointed by it (who shall be independent of the parties) and brief description of the dispute that it desires to put to arbitration. Unless the parties agree upon a sole arbitrator, the other party shall, within fifteen (15) days thereafter, appoint an arbitrator (who shall be independent of the parties), and the two arbitrators so named shall, within fifteen (15) days, appoint a third arbitrator (who shall be independent of the parties), failing agreement on which such third arbitrator shall be appointed by the Society of Maritime Arbitrators, Inc. The decision or award of the sole arbitrator or any two of the panel of three arbitrators on any point or points shall be final and binding upon the parties. If the party upon whom the demand for arbitration is served fails or refuses to appoint an arbitrator within the fifteen (15) days, the single arbitrator shall have the right to decide alone, and his decision or award shall be final and binding upon the parties. The arbitrators may be, but are not required to be, commercial persons, conversant with shipping matters. The arbitrator or arbitrators shall have the discretion to impose the cost of the arbitration, including reasonable attorneys' fees and expenses, and arbitrator's fees upon the losing party or to divide it between the parties on any terms that may appear just. Judgement may be entered upon any award made hereunder in any court of competent jurisdiction. To the extent not otherwise set forth herein or agreed by the parties, the arbitration shall be governed by the rules of the Society of Maritime Arbitrators, Inc. current at the time the arbitration proceedings are commenced; provided, however, that for disputes where the total amount claimed by either party does not exceed $250,000 (exclusive of interest on the sum claimed, costs of the arbitration, and legal expenses), the arbitration proceedings shall be governed by the Shortened Arbitration Procedure of the proceedings are commenced. Notwithstanding the foregoing agreement to arbitrate, and without limiting the generality of Clause 46(b)(3), the parties expressly reserve the right to seek provisional relief from any court of competent jurisdiction to preserve their respective rights pending arbitration, and in seeking such relief shall not waive the right of arbitration.

(2) The arbitrators shall render a reasoned opinion in writing in support of their decision, and shall award reimbursement of reasonable attorneys' and other experts' fees and disbursement and other costs of arbitration to the prevailing party, in such a manner as the arbitrators shall deem appropriate. In addition, the losing party or parties shall reimburse the prevailing party or parties for reasonable attorneys' fees and disbursements and court costs incurred by the prevailing party in successfully seeking any preliminary equitable relief or judicially enforcing any arbitration award.

(3) The arbitration provisions of this Clause 46 shall not be deemed to preclude any party hereto from seeking preliminary injunctive or other equitable relief to protect or enforce its rights hereunder, or to prohibit any court from making preliminary findings f fact in connection with granting or denying such preliminary injunctive relief pending arbitration, or to preclude any party hereto from seeking permanent injunctive or other equitable relief after and in accordance with the decision of the arbitrators. Nothing herein shall be construed to mean that any decision of the arbitrators is subject to judicial review or appeal, and parties hereto hereby waive any and all rights of judicial appeal or review, on any ground whatsoever.

(4) WAIVER OF JURY TRIAL

EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS CHARTER OR THE TRANSACTION CONTEMPLATED HEREBY.

(5) It is acknowledged that cargoes that are carried under this Charter may, from time to time, be owned by or be under the risk of loss of subsidiaries or affiliates of Charterers (hereafter "Affiliate" or " Affiliates"). In the event that an Affiliate owns cargo or otherwise has the risk of loss for any cargo carried hereunder, and in the event of cargo loss or damage to such cargo, it is hereby agreed, without prejudice to any and all other rights that the Affiliate may have under the Bill of Lading and/or governing law, that the Charterers may claim damages against Owners in accordance with the provisions of this Charter, including this Clause 46. In such case, the provisions of this Charter shall govern whether Charterers are entitled to recover against Owners for such loss and damage. In such case, title to and risk of loss for such cargo shall be deemed to be held by Charterers. Affiliate shall otherwise be at liberty to pursue the same claim, including pursuing such a claim at the same time as Charterers hereunder. The Owners shall in no event be liable twice on the same claim and any payment or settlement by the Owners to the Affiliate or Charterers shall extinguish the claim.

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document.

Code word for this Charter Party
"SHELLTIME 4"

Issued December 1984 amended December 2003

Confidentiality 47. Owners and Charterers mutually agree to keep the terms and conditions of this Charter strictly confidential unless both parties consent to disclosure of such confidential information, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, in the event that disclosure of the terms and conditions hereof is required by law or any governmental agency, the party making such disclosure shall promptly notify the other party of the legal requirement and the nature and extent of the legally compelled disclosure. Thereafter, both parties shall take all available steps to maintain, to the greatest degree possible, the continued confidentiality of this Charter.

Construction 48. The side headings, Additional Clauses and Rider Clause captions have been included in this Charter for convenience of reference and shall in no way affect the construction hereof.

Appendix A: OCIMF Vessel Particulars Questionnaire for the vessel, as attached, shall be incorporated herein.

~~Appendix B: Shell Safety and Environmental Monthly Reporting Template, as attached, shall be incorporated herein.~~

Additional Clauses: Shelltime 4 Additional Clauses 1 through 17 of this Charter shall be incorporated herein and made a part hereof.

| | |
|---|---|
| SIGNED FOR OWNERS | SIGNED FOR CHARTERERS |
| DANIEL J THOROGOOD | ERIN N KANE |
| FULL NAME | FULL NAME |
| PRESIDENT + CEO | PRESIDENT + CEO |
| POSITION | POSITION |

MCS 11/11

This document is a computer generated SHELLTIME 4 (as revised 2003) form printed by BIMCO's idea with the permission of Shell. Any insertion or deletion must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the Shell-approved text of SHELLTIME 4 (as revised 2003) shall apply. BIMCO and Shell assume no responsibility for any loss, damage or expense caused as a result of discrepancies between the SHELLTIME 4 (as revised 2003) document and this computer generated document

Code word for this Charter Party
"SHELLTIME 4"

Issued December 1984 amended December 2003

SHELLTIME 4 ADDITIONAL CLAUSES

Code word for this Charter Party
"SHELLTIME 4"

Issued December 1984 amended December 2003

Bunker Emissions

1. (a) Should Charterers trade the Vessel into a SOx Emission Control Area ("SECA") as defined in Annex VI of the International Convention for the Prevention of Pollution from Ships ("MARPOL"), then the Charterers shall supply fuels:
   (i) of such specifications and grades that will comply with the maximum sulphur content requirements of the SECA;
   (ii) from bunker suppliers who comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes; and
   (iii) which comply with the ISO 8217:2010 specification or any subsequent amendments thereof.

(b) Owners warrant, in the event the vessel trades in a SECA, that the Vessel:
   (i) complies with Regulation 14 and 18 of MARPOL Annex VI and with the requirements of the SECA;
   (ii) is able to consume fuels of the required sulphur content when ordered by the Charterers to trade within the SECA; and
   (iii) will provide segregated storage for this fuel.

(c) Subject to having supplied the Vessel with fuels in accordance with this clause, and provided the specification and grade of such fuels supplied to the vessel does not change at any time during the charter period, the Charterers shall not be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's non-compliance with Regulations 14 and 18 of MARPOL Annex VI.

Stopia/Topia

2. Owners warrant that where the vessel is a "Relevant Ship", they are a "Participating Owner" as defined, as applicable, in the Small Tanker Oil Pollution Indemnification Agreement ("STOPIA") or in the Tanker Oil Pollution STOPIA or TOPIA (as applicable) and shall so remain during the currency of this charter provided always that STOPIA or TOPIA (as applicable) is not terminated in accordance with its provisions.

Speed, Consumption

3. Owners warrant that, consistent with the safe operation of the vessel, the vessel is capable of maintaining the below parameters throughout the charter period.

(a) Warranty Speed: 14.5 knots average per day on all sea passages from pilot station to pilot station under weather conditions up to and including Beaufort scale 4 as determined by mutually agreed ocean routing service in laden and ballast condition. An allowance of one-half (0.5) knot shall be made before penalty is applied on average speed performance. Speed will be determined by taking actual miles from full away on passage until end of passage, divided by the total hours at sea as shown in the voyage abstract, excluding stops at sea and any sea passage covered by an off-hire calculation.

(b) Fuel Consumption (in metric tons per day):
Main Engine (MDO) Laden: 35.0, plus 5.0% allowance
Main Engine (MDO) Ballast: 35.0, plus 5.0% allowance
Auxiliaries (MDO) Laden/Ballast: 5.0, plus 5.0% allowance
Auxiliaries (MDO) Loading: 6.0, plus 5.0% allowance
Auxiliaries (MDO) Discharging: 10.0, plus 5.0% allowance
Auxiliaries (MDO) Idle: 3.0, plus 5.0% allowance

The average fuel consumptions shall be calculated by reference to the observed distance from pilot station to pilot station and corrected by currents and winds and on all sea passages during each applicable period, but shall exclude (i) any period during which the vessel is off hire, (ii) any cargo heating or tank cleaning periods, (iii) any periods during which reduction of speed is necessary for safety in congested waters or in poor visibility, and (iv) any days, noon to noon, when winds exceed force 4 on the Beaufort Scale for more than 12 consecutive hours.

(c) In the event vessel is ordered by Charterers to deviate or reduce speed during a voyage, or if the vessel deviates or alters speed for the purpose of safe navigation and/or sound operation of the vessel as determined by the Master, such deviation distance and time shall be recorded by the Master on the voyage abstract and said deviation shall be excluded from the foregoing speed and fuel consumption performance warranty calculation.

This document is a computer generated <DOCNAME> form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

| | | |
|---|---|---|
| LayCan | 4. | The laycan of June 5, 2021 through July 5, 2021 anticipates a redelivery of the Vessel, under the expiring Charter Party dated November 24, 2017, at the designated Houston sea buoy, or some other mutually agreed location i.e. natural deviation point for dry-docking location, around April 15, 2021 subject to drydock availability and in line with Charterers system requirements. Such laycan cancellation date shall be adjusted to align with any delay in the aforementioned redelivery date whether caused by delay in redelivery due to Charterer system or delay in drydocking start day due to drydock availability.<br>If, because of an unanticipated delay, Owner becomes aware that the Seabulk Challenge will not deliver within the stated laycan above, then Owner shall notify Charterer as soon as practical with an updated laycan. Charterer shall, within two (2) running days of notification, notify the Owner of their approval of such updated laycan, such approval shall not to be unreasonably withheld. Owner to narrow laycan to a two (2) week window no later than fifteen (15) days after redelivery under expiring Charter Party. Further Owners to provide ten (10), seven (7) and five (5) day estimated notices and three (3), and one (1) day definite notices. Owner will use reasonable efforts to assist Charterer with marine transportation requirements while Seabulk Challenge is undergoing regulatory surveys. |
| Contract of Affreightment (COA) | 5. | Contract of Affreightment (COA) During the term of the contract Owner has right to approach Charterer with a COA proposal and Charterer agrees to meet to discuss and review proposal in good faith with the express understanding that Charterer will require terms that provide suitable visibility, reliability of ETA timeliness, ratability and security of required cargo volumes. |
| Broker/ Commission | 6. | Commission of 1.25% shall be payable by Owners to NETCO on the actual amount of monthly charter hire received within thirty (30) days of receipt. |
| Pumping Clause | 7. | Owners warrant that the vessel is capable of discharging her entire homogeneous cargo within twenty-four (24) hours or maintaining one hundred (100) psi at the vessels rail, provided shore facilities permit and excluding any time for stripping.<br>Owners shall instruct the Master to clarify by protest letter or remarks in the vessels pumping logs, countersigned by receivers (only if such receivers are available and willing to sign such protest letter or remarks), whenever pumping time exceeds the warranted period. Any time lost as a result of the vessel being unable to load or discharge her cargo in accordance with the warranty stated above shall be deducted from daily hire, pro-rata, provided however that such excess time has not been cause by shore conditions and/or weather conditions and/or any actions by Charterers, their agents or representatives. |
| Additional Trading Restrictions | 8. | Charterers shall not: (a) cause or permit the vessel to be sub-chartered or sub-leased to, or cause or permit the vessel to serve under any contract with, a person on the List of Specially Designated Nationals and Blocked Persons published by the Office of Foreign Assets Control of the United States Treasury Department (OFAC), any similar list published by the United Nations or the European Union or any member country thereof, or any similar list published under any applicable of any other jurisdiction; (b) cause or permit the vessel to call on any port or ports, carry any cargo or passengers, or otherwise participate, directly or indirectly, in any activity or activities that would subject Owners or Charterers to any sanctions, including fines, penalties and other measures, or cause the vessel or any assets of the Owners or Charterers to be blocked, under the laws of the United States, any member country of the United Nations or the European Union, or any other applicable jurisdiction, related to embargoes or restrictions on trade or transactions with any country or person; and (c) violate or engage in any transaction that violates any other applicable regulations existing now or adopted from time to time after the date hereof by OFAC restricting trade with particular foreign countries. |
| Unplanned Offhire | 9. | In the event the Vessel encounters an unplanned off hire event that is expected to last in e xcess of twenty-five (25) days and the Owner is unable to provide short term coverage after ten (10) consecutive days of off hire and the Charterer is required to complete a spot voyage at the then prevailing market rates thereafter, then the Owner will reimburse the Charterer for documented spot voyage freight costs less the daily Rate of Hire under this Charter and fuel and port charges for actual spot voyages days. Charterer shall be allowed to perform a maximum of one (1) full round trip voyage, and if off hire extends to thirty five (35) days, then Charterers will be allowed a second (2nd) full round trip voyage. Owners' cumulative net obligation for such reimbursement shall be capped at $1,500,000 for the term of the Charter. |
| Waiver of Consequential Damages | 10. | Neither party shall be liable for any special, indirect or consequential damages of any kind suffered by the other party in connection with this Charter, including, but not limited to, any loss of profit or revenue, loss of use of property or equipment, and loss of contract, regardless of the cause of such damages and even if caused by the negligence (whether sole, concurrent, active, passive or gross), breach of duty (whether statutory, contractual or otherwise) or other fault of either party or any other person or entity, or the unseaworthiness of any vessel. For the avoidance of doubt, this Clause shall not apply to any demurrage or other compensation due to Owners under this Charter. |
| Long Term Shipping Solution Meeting | 11. | Charterer and Owner agree to meet in order discuss more modern and longer term shipping solutions. Such meeting shall occur no later than twelve (12) months after delivery of Vessel under this Charter. |

| | | |
|---|---|---|
| Counterparts | 12. | This Charter may be executed in several counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument. The signature of any party hereto to any counterpart hereof shall be deemed a signature to, and may be appended to, any other counterpart hereof. In the event that any signature to this Charter or any ancillary agreement is delivered by facsimile transmission or by e-mail delivery of a .pdf format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or .pdf signature page were an original thereof. Once signed, this Charter may be delivered by facsimile or .pdf format, and any reproduction of this Charter made by reliable means (e.g., photocopy, facsimile or portable document format) is considered an original. |
| Severability | 13. | In the event any one or more of the provisions of this Charter shall for any reason be held by a court of competent jurisdiction to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Charter operates or would prospectively operate to invalidate this Charter, then and in any of those events, such provision or provisions only shall be deemed null and void and shall not affect any other provision of this Charter and the remaining provisions of this Charter shall remain operative and in full force and effect and shall in no way be effected, prejudiced or disturbed thereby. |
| Waiver | 14. | No benefit or right accruing to either party under this Charter shall be waived unless the waiver is reduced to writing and signed by both parties. The failure of either party to exercise any of its rights under this Charter, including either party's failure to comply with any time limit set out in this Charter, shall in no way constitute a waiver of those rights, nor shall such failure excuse the other party from any of its obligations under this Charter. |
| Entire Agreement | 15. | This Charter and its exhibits supersede all prior agreements between the parties with respect to its subject matter, and constitute a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. |
| Amendments | 16. | The terms of this Charter shall not be altered, modified, amended, supplemented or terminated in any manner whatsoever except by written instrument signed by both parties. |
| Notices | 17. | a) Except as otherwise provided in this Charter, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Charter shall be in writing and shall be deemed to have been delivered (i) when personally delivered, (ii) on the day (except, if not a Business Day, then the next Business Day) when transmitted via telecopy (or other facsimile device) to the number set out below if the sender on the same day sends a confirming copy of such notice by a recognized overnight delivery service (charges prepaid), (iii) the day following the day (except, if not a Business Day, then the next Business Day) on which the same has been delivered prepaid to a reputable national overnight air courier service for next day delivery, or (iv) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid. "Business Day" shall mean any day that is not a Saturday, Sunday or other day on which banking institutions doing business in New York, New York are authorized or obligated by law or required by other government action to close.<br>(b) The address and facsimile numbers of Owners and Charters for service of such communications shall be as follows, provided that either party may change its address or facsimile numbers listed below by notifying the other party of such change in the manner prescribed by this Additional Clause 18 |

Owners:
SEA-Vista Newbuild I LLC
2200 Eller Drive
Fort Lauderdale, Florida 33316
Attn: Jorge Del Rey
Fax: (281) 670-0702
E-mail: jdelrey@ckor.com

Charterers:
AdvanSix Inc.
300 Kimball Drive
Parsippany, NJ 07054
Attn: Brian Barber
E-mail: Brian.Barber@Advansix.com